v. InvestPic, Inc. v. InvestPic, Inc. v. InvestPic, Inc. Next case is SAP America v. InvestPic, 2017-2021. Mr. Key. Good morning, Your Honors. May it please the Court, I'm Jay Kaysen for the appellant in InvestPic. I will begin by providing a brief overview of the invention of the 2-9 patent and then discuss why the 2-9-1 patent claims constitute eligible subject matter. So why don't we look at the claim, because that's what counts. Method for calculating, analyzing, and displaying data. Isn't that quintessentially abstract? The preamble, yes, Your Honor, because it's simply setting out what it does, but the claims go on to recite very specific claim limitations, such as a bias parameter. So there are a bunch of details about how the analysis takes place, but then you end with, okay, we have a display, namely a graph, a plot of the result of the analysis. Full stop, nice information. How is that not squarely in the abstract category? It doesn't even say what you do with the information, even to move it into some market choice, which I'm not sure would help, but it doesn't even do that, does it? Your Honor, this is a method for predicting how a portfolio would perform, and the method is very precise. For example, it talks about getting a- But there are lots of very precise mathematical calculations. These are not just calculations, Your Honor. This is a user-defined parameters, and user-defined queries are posed to the system. So it begins with basically the user deciding the conditions under which the modeling is going to take place, and then you have the creation of a sample space, and as this court has previously held in 2016, then one of the key inputs from the user is the bias parameter, and that bias parameter doesn't have anything to do with creating the sample space, which the user says, but it has to do with modeling the conditions under which the user wants the investments to be modeled. But isn't this much like there's a garbage in, garbage out problem, and that what you all have said is that when the assumptions being used are bad, the data that gets produced are bad, or at least not good enough, and what you're doing is coming up with a better set of assumptions, and so you put those assumptions into a computer, and you get a better result at the end, but how is that an actual technological advancement as opposed to just a brilliant idea? I mean, it sounds like a brilliant idea. Don't get me wrong. So it doesn't stop at the brilliant idea, Your Honor. It operationalizes the idea, because it allows you to set the bias parameter, and it is set in sample selection. It's not in creating the sample space, but it actually tells you, pick more of whatever kinds of market conditions you're interested in, the number of up days, the number of down days, and then you pick the samples based on that. So in other words, it operationalizes that idea. So it's not just simply about improving it, but improving it in a very specific way, and then... So what's novel about allowing a different set of biases to be set? Actually, Your Honor, such a concept didn't exist. It was completely an artificial construct. It was developed by Dr. Varma, and this court has, in 2016, found that it was a novel and non-obvious concept, and that was then specifically operationalized, because this court found that the bias parameter is not about algebraic calculations of statistical measures, or algebraic combinations. In fact, it is about the degree of randomness in sample selection that the user sets. So once the user sets that, then the user can see how these particular investments will perform, and even more importantly, the process requires that you maintain the temporal correlation between investments, so that you can more accurately predict what is going to happen. So the claims recite these limitations very precisely. On top of that, the claims talk about a single statistical request that then corresponds to two or more investments. So all of these elements are designed to claim a very specific method with very specific limitations, which were completely ignored by the district court, and the district court simply oversimplified and overgeneralized the claims. What does the bias parameter do other than allow for a manipulation of data? So the bias parameter is basically a construct, and it's designed to set the parameters for the analysis. It's very similar to, for example, the static price index, which was found to be an inventive concept in trading technologies. This is very similar to the coefficients relating to the temperature in Exergen. It's not just a number. It is, in fact, a key way of capturing what the user wants. But both in Exergen and in trading technologies, there were assertedly new physical things going on. Exergen, the new physical thing of a certain kind of swiping that allowed essentially a thermometer to get a good reading without even knowing where the artery was. And in trading technologies, it was the creation of a particular kind of visual display that arrayed two different kinds of information next to each other. But here, there is nothing physical that happens at the end of this process. Actually, Your Honor, resampling itself is a physical process. It actually requires you to basically fetch and load data and input them in registers. And then you basically create additional data based on the data that exists. So by itself, it's a physical process. In addition, just like trading technologies, we do have an output as well. We have an explicit output of distributions. You have a display. Right, but trading technologies was in part about a specific way of displaying on a screen certain information. You have a plot of the information. Right. We understand that. And that was about an improved graphical user interface, and I agree with you, Your Honor. My only point here is that we also have physical processes going on here with resampling, and we also have a meaningful output for, say, maximum drawdown, gross rate of return, and so on. How does the resampling occur? I'm sorry, Your Honor? How does the resampling occur? So the resampling occurs by once you have samples of the investments, and you've decided to sample them across multiple days, and you've determined how many of up, downs, and down days to sample based on the bias parameter, then you basically physically make multiple copies of that data, maintaining that temporal correlation between the stocks, so that that way you know how the stocks relate to each other and also how they relate within each other. And that's your cross-correlation and auto-correlation. This is to make sure that you actually have captured how they relate to each other, because you might think you've got diversified investment, but you actually don't. And so you keep the temporal correlation, and then you make multiple… And in fact, resampling across a series of stock transactions is not new. What's new here is what your measure for resampling is, right? So what is new is two things. One is, you're absolutely correct, Your Honor, resampling is not new. And, you know, Bradley Efron came up with resampling and bootstrapping and so on. His work is part of the record. But what we've done is not just resampling any data. We decide how to resample the biased samples. So we let the user pick what samples that you're going to do resampling on. And you're not just doing resampling generically. You're doing resampling in a particular way, keeping the temporal correlation, for example. And the prior art methods on the record have other ways of doing resampling. For example, the Sortino case, the Sortino reference, which was mentioned in the 2016 case before this court, that had a different method of doing resampling. So what we're talking about here is actually a new and improved method of analysis that uses features such as biased parameter. It comes up with new and specific limitations on the resampling itself. And in addition, we try to trigger this with user input and provide the output in a form so that the user can perhaps redo the analysis again and change the conditions that they want so that there is an accurate prediction of how that portfolio will perform under the kinds of conditions that the user is interested in modeling. So here, our key point is that there are critical claim limitations that should have been taken into account by the district court. And if they had taken it into account, they would realize that the claims were not directed to an abstract idea. You're not disputing that Claim 1 is representative, are you? Well, it's a representative claim of the method claim. There's Claim 11 as well. It's a method claim. And Claim 22 is a system claim. So in addition, what the 291 patent does is it comes up with a computerized system where this method, if we have a lot of data, how we can efficiently execute that. We had that issue in Alice where there was a system claim or an apparatus claim and the Supreme Court said it didn't make any difference if all it was doing was practicing the method. Yes, Your Honor. The difference is this. Here, we have very specific kinds of hardware that are explained and recited. We talk about not just any generalized resampling computerized system, which would be just like the Alice model. But here, we're talking about having parallel processors where the data is vectorized to specifically handle that kind of data and to do it efficiently. For example, Figure 12 in the patent talks about the specific vectorization. It talks about specific kinds of databases. And in addition, the system is designed to accomplish the resampling, keeping temporal correlation. So the system claims are much narrower. It is not just some generic system. Counsel, you're well into your rebuttal time. Would you like to save it or continue? I would like to save it, Your Honor. Thank you. Ms. Vidal. What is it, Your Honor? Would you mind starting where he left off, which is what is it about the system claims? I mean, do you dispute his contention that the system claims are farmer-specific? The system claims do add generic computer components. If you look at all the components that are added, like parallel processors and some of the other components, they're all generic. There's nothing in the specification that says otherwise, and appellants have not otherwise said that these are specific components. There's something unique about them or something inventive about them. This case is not distinguishable from Fluke. The district court recognized that on page 16 of their opinion. In both cases, in Fluke and in this case, you have a mathematical algorithm and you have a result. In Fluke, you had a mathematical algorithm related to setting an alarm limit, and the result was a varying alarm limit that was set. Here you have a mathematical algorithm, and the result is a distribution plot. So for that reason, these claims should be held not patent eligible. They've been held to be non-obvious, right? They've been held to be non-obvious. That's correct. That's correct. The abstract idea may be non-obvious, but that does not affect the analysis when it comes to determining whether the abstract idea is indeed abstract. Because the abstract idea is math, according to Gottschalk, it is abstract. In terms of what was held in our prior case as to why it was non-obvious, are you saying that the only thing they said was non-obvious was the choice of data input? It's a combination. They said what was non-obvious was the choice of data input, so the bias parameter combined with the resampling method. That, in and of itself, is math. And if you look at the joint appendix, pages 51 through 53, you'll see all the mathematical formulas that control that math. That is the only thing that was alleged to be non-obvious, and that is not a proper determination when determining whether the math is an abstract idea. So your response to your friend on the other side is that his argument that his resampling method was unique and different doesn't matter. It doesn't matter, and the district court assumed that it would be. The district court said even if it is new and unique, that does not control. When determining whether an idea is an abstract idea, you need to look beyond that. You need to look at whether it's mathematical, as in Gottschalk. That determines that this is abstract. But if it's abstract, you can then go to step two to see if it's inventive. And that's the European word for non-obvious. So you cannot look at whether the abstract idea is inventive. You need to look at what was added to the abstract idea. Alice dictates that. In this case, that argument was never made. That said, the district court did go that step further. The district court applied Alice step one,  and that that was abstract. And then the district court stepped through each and every dependent claim, each and every additional limitation, and found that all of those additional limitations were either generic computer components, like processors, or they were insignificant pre- and post-activity. But why isn't the ordered combination of biased parameter plus resampling system, why isn't that enough to make it inventive under step two? If you look at Fluke, Fluke talks about the circumference of a circle, and says that the formula for circumference of a circle is abstract. It's 2 pi r. And basically what you would be saying is, because r is an input to that, if you choose r one way and then you put r into the formula, now somehow because you've combined a way of choosing r and a formula, that that is somehow inventive. And it's not. The biased parameter is just an input into the distribution, just as r, the radius of a circle, is an input into the equation for the circumference of a circle. I have nothing further to add. Can I just ask, would it be fair to say that the consequence of adopting the position that you're urging is that some fairly wide range of mathematical innovations used for finance would be categorically ineligible under 101? It would be fair to say, I would say yes, in the sense that if you're using probability distributions to mimic behavior in the market or any other behavior, that is not patent eligible. I mean, if you look at the patent, it talks about the bell curve, which is used all over the place. It's used to estimate intelligence. It's used to estimate height. You can't patent that formula just the same way you can't patent the formulas in this patent. And yes, a lot of those can be used to model financial markets. You can use the Gaussian normal distribution to model financial markets. That doesn't make it patentable just because the financial market, the data happens to fall in a certain curve. What about the timeline limitation of the claims? It's, again, a formula. If you look at pages 51 to 53 of the patent, there's a specific formula for that. So all of those additional parameters just say how you shift and how you adjust that curve. It's all still a distribution. Every invention ultimately mathematical in the long run? I mean, is the overlay of math the end of the inquiry? No, the overlay of math would be one thing. This is only math. If there was math and then there was something more, as in trading tech. In trading tech, there was math, but then there was a GUI. There was an interface that was new and inventive. Here we only have the math. We only have the formulas on pages 51 and 53 of the joint appendix, on those pages of the patent, and nothing more. And, yes, math may underlie a lot of what goes on in the world, but what's patentable has to be something more than just math. It's going to transcend financial institutions and other areas. Thank you, Counsel. Thank you. Mr. Key has a little rebuttal time, two and a half minutes. Thank you, Your Honors. Your Honors, the Invespig patent claims are not like Fluke. In Fluke, we had a mathematical formula that was recited in the claims. There is no mathematical formula recited in Invespig. What the Supreme Court said was, if you assume that that mathematical equation is in the prior art, there's nothing else left in Fluke. That's what the Supreme Court said. That is not what is going on here. There is no mathematical expressions in the claims. What we have here is a particular method of trying to get around some prior limitations. Counsel is correct. The patent does talk about the Gaussian distribution. What we have is a method to get past making that assumption. Don't make that assumption. Instead, look at how the data is and how the investments performed so that you take the distribution as they existed in the past. That is basically the so-called Frequentist tradition. Then you apply that. You apply the Bayesian probabilities from the bias parameter and you combine both those approaches in a very specific method. We're not talking about high-level combining of Frequentist and Bayesian. We're talking about doing so in a very specific way. Taking the bias parameter into account, which is the Bayesian approach. Taking the re-sampling, and that's the Frequentist approach. We put them together in a very specific way. The equations correspond to how you do the autocorrelation. They correspond to how you determine the maximum drawdown. That's not in the claims. Those are just very specific enabling details. There is no math and there's no equations in the claim. What we have here is a very specific way of doing predictive analytics. This is what data science is about. If somebody else wants to model this in some other way, they want to model it using a bias parameter, that's fine. If they don't want to do it, they want to do it some other way, they're absolutely free to do that. They're, of course, free to use re-sampling. They're free to simply not even have any user input and simply show the user a whole bunch of different conditions. What we're saying is there is a very specific way of doing this. Your Honor, the district court did not even consider, cite, or refer to this court's decision in 2016. It simply did not engage with the claim limitations at any level. It simply said this is an abstract method of manipulating data. Your Honor, we did, in fact, argue in the district court. Counsel, as you can see, your red light is on. Your time has expired, so we will take the case under advisement. Thank you, Your Honors.